USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/01/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JIMMY VIERA, as Administrator of the Estate
of MELISSA AVILEZ,

                        Plaintiff,

          -against-

UNITED STATES OF AMERICA,

                     Defendant.

----------------------------------------------------------------X

**MEMORANDUM
DECISION AND ORDER**

**No. 18-cv-9270 (KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Jimmy Viera brings this suit against the United States of America, pursuant to the

Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, as the Administrator of the Estate of Melissa

Avilez.  Mr. Viera, on behalf of Ms. Avilez's estate, asserts that employees of Urban Health Plan

Inc. ("Urban Health"), a federally-funded health clinic, committed medical malpractice by failing

to properly evaluate and timely diagnose Ms. Avilez's breast cancer, resulting in a delayed

diagnosis that substantially decreased her chance of survival.  Plaintiff seeks damages for the pain

and suffering and loss of enjoyment of life experienced by Ms. Avilez between her cancer

diagnosis and death, damages stemming from the loss of parental guidance for her eight-year-old

son, and economic damages comprising lost earnings and lost household services.

      Urban Health treated Ms. Avilez on three relevant occasions:  December 16, 2014;

February 28, 2015; and August 25, 2015.  (*See* Joint Exhibit 1.)  Ms. Avilez also sought treatment

from Bronx Lebanon Hospital Center ("Bronx Lebanon") for complaints about her right breast.

The relevant treatment at Bronx Lebanon took place between May 18, 2015 and sometime

around December 27, 2017.  (*See* Joint Exhibit 2 at BL007, 138 ("JX 2").)  Bronx Lebanon ultimately

diagnosed Ms. Avilez's breast cancer during a March 6, 2017 biopsy, which they informed her of during a March 16, 2017 visit.  (JX 2 at BL093, 101, 126.)  She underwent a surgical double mastectomy to remove the cancer on April 19, 2017, at which time there was no detectable metastases.  (JX 2 at BL130.)  On December 9, 2017, Ms. Avilez was diagnosed with a resurgence of metastatic breast cancer.  (JX 2 at BL124-25, 136, 140.)  Ms. Avilez passed away on January 14, 2019 at the age of thirty from metastatic breast cancer, leaving behind her partner, Mr. Viera, and their eight-year-old son.  (Joint Pretrial Order at Section III, ¶1-2, ECF No. 78 (hereinafter "Stip.").)

From August 10-13, 2020, this Court held a bench trial in this matter.[1]  The issues tried were whether Urban Health failed to follow the standard of care when treating Ms. Avilez, whether any such failure resulted in a delayed diagnosis that proximately caused her injuries and death, and whether Bronx Lebanon's involvement with Ms. Avilez's breast treatment impacted the duties and standards of care owed by Urban Health to Ms. Avilez.  The Court also was asked to address damages to the extent liability is found.[2]

Plaintiff called four witnesses in her case-in-chief:  Jimmy Viera, Ms. Avilez's partner; Aizak Viera, Ms. Avilez's son; expert Dr. Martin Gubernick, an obstetrician/gynecologist; and expert Dr. Alexander Hindenburg, an oncologist.  Plaintiff also submitted the *de bene esse* video deposition testimony of Ms. Avilez, conducted on December 6, 2018, a month before her death. For the defense, the Government called Kerry-Ann DaCosta, Certified Nurse Midwife ("CNM"), who provided care to Ms. Avilez at Urban Health; expert Dr. Syed Hoda, a pathologist; and expert

---

[1] The parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 626(c).  *See also* Fed. R. Civ. P. 73.

[2] The parties have stipulated to the fact that the total value of Ms. Avilez's lost earnings is $79,520 and the total value of lost household services is $158,020 if the Court determines that Plaintiff is entitled to damages.  (Stip. ¶ 5.) Thus, the only damages the Court has been asked to determine are for pain and suffering and loss of enjoyment of life and loss of parental guidance.

Dr. Michael Nathenson, an oncologist.  The Government also submitted the deposition testimony of Edwin Santiago, CNM, conducted on August 14, 2019, who also provided care to Ms. Avilez at Urban Health, and a declaration from CNM DaCosta.  The parties jointly submitted the following exhibits:  Joint Exhibit 1, records of Ms. Avilez's treatment from Urban Health (UH001-07) ("JX 1"); Joint Exhibit 2, records of Ms. Avilez's treatment from Bronx Lebanon (BL001-144) ("JX 2"); and Joint Exhibit 3, Ms. Avilez's autopsy report from New York Presbyterian Hospital (NYP001-13). The Government submitted two additional exhibits:  Government Exhibit 1, record of a July 26, 2016 visit by Ms. Avilez to Urban Health (GX1-001-003), and Government Exhibit 2, the ultrasound referral provided by CNM Santiago on February 28, 2015.  The Government's exhibits were admitted into evidence without objection from Plaintiff.

This Memorandum Decision and Order constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.  This Court finds for Plaintiff and awards damages in the amounts indicated below.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58."  Fed. R. Civ. P. 52(a)(1).

## FINDINGS OF FACT

Ms. Avilez was born on October 24, 1988 and died on January 14, 2019 as the result of primary angiosarcoma of the breast, a type of breast cancer.  (Stip. ¶1.)  She is survived by her partner, Mr. Viera, and their son, who was eight years old at the time of her death.  (*Id.* ¶ 2.)

Urban Health is a federally-funded health clinic located in the Bronx, New York, and Bronx Lebanon is a hospital center also located in the Bronx.  (*Id.* ¶ 3.)  Registered Physician's Assistant

Sandra Pineros ("PA Pineros"), CNM Edwin Santiago ("CNM Santiago") and CNM Kerry-Ann DaCosta ("CNM DaCosta") were employees of Urban Health who treated Ms. Avilez during the relevant period.  (*Id.*)

### A.      Angiosarcoma of the Breast

Angiosarcomas are rare cancers that develop in the inner lining of blood vessels, most commonly in the skin, liver, spleen, breast, and deep tissue, and sometimes the lymph vessels. (Trial Testimony of Dr. Syed Hoda, dated August 11, 2020, Tr. at 154:1-5 ("Dr. Hoda Tr."); Trial Testimony of Dr. Michael Nathenson, dated August 12, 2020, Tr. at 9:1-11 ("Dr. Nathenson Tr.").) They are a sub-type of sarcoma, which is a general term for cancers that begin in the bones and in the soft tissue.  *See* https://www.mayoclinic.org/diseases-conditions/sarcoma/symptoms-causes/syc-20351048 (last visited Sept. 29, 2020).  Sarcomas represent roughly one percent of all breast cancers diagnosed on an annual basis in women in the United States.  (Dr. Hoda Tr. at 154:24-155:5; Dr. Nathenson Tr. at 8:8-11.)  Angiosarcomas constitute one percent of all sarcomas.  (Dr. Hoda Tr. at 155:22-25; Dr. Nathenson Tr. 9:13-16.)  Breast angiosarcomas are further categorized as primary or secondary.  (Dr. Hoda Tr. at 156:10-20; Dr. Nathenson Tr. at 9:20-10:12.)  A primary angiosarcoma is one that develops with no known risk factors or causes. (Dr. Hoda Tr. at 156:12-15; Dr. Nathenson Tr. at 9:20-10:12, 10:21-11:10.)  A secondary angiosarcoma is one that develops after some known carcinogenic event, such as radiation therapy treating some other type of cancer.  (Dr. Nathenson Tr. at 9:20-10:8.)  Primary angiosarcomas constitute roughly 0.05% of all known breast malignancies recorded annually in the United States, which comes out to roughly 130 women per year using American Cancer Society statistics.  (Dr. Hoda Tr. at 156:25-157:2, 157:9-11; Dr. Nathenson Tr. at 9:13-16.) Ms. Avilez was diagnosed with primary angiosarcoma.  (Dr. Hoda Tr. at 156:16-20.)  She was

twenty-eight years old at the time.  (JX 2 at BL093.)  The majority of primary breast angiosarcomas cases are observed in women aged forty and older.  (Dr. Nathenson Tr. at 95:1-5.)

Breast angiosarcomas are highly aggressive cancers and are labelled according to the highest observed pathologic grade present in a specific sample.[3]  (Dr. Hoda Tr. at 181:15-20; Dr. Nathenson Tr. at 22:19-23:2.)  Grade 2 and 3 cells, which constitute intermediate and high-grade cancer, respectively, indicate a very fast growth rate relative to other cancers.  (Dr. Hoda Tr. at 185:7-14.)  Angiosarcomas of the breast also tend to modulate or metastasize hematogenously, meaning through the blood, whereas other breast cancer tends to metastasize through the lymph system.  (Dr. Hoda Tr. at 174:21-175:6; Dr. Nathenson Tr. at 118:16-119:9.)  If angiosarcoma is found in a patient's lymph nodes, this is clear evidence that the angiosarcoma metastasized. (Dr. Nathenson Tr. at 118:16-119:9.)  Due to angiosarcomas' aggressiveness and modulation, they often achieve this metastatic state, meaning they spread throughout the body after starting in a given location of the body, quite quickly relative to other cancers.  (Dr. Nathenson Tr. at 14:16-15:25.)  As a result, the disease is associated with very poor outcomes, particularly in comparison to more common types of breast cancers.  (Dr. Hoda Tr. at 174:21-175:6.)  The five-year-survival rate for individuals with angiosarcomas discovered when they are five centimeters or larger in size is significantly worse than those discovered at smaller sizes.  (Dr. Nathenson Tr. at 99:8-101:1.)

### B.    Ms. Avilez's Medical Treatment

The relevant record begins on December 16, 2014, when Ms. Avilez went to Urban Health

---

[3]  A tumor grade is based on how abnormal the tumor cells and tissue look under a microscope and is an indicator of how likely the tumor is to grow and spread.  *See* https://www.cancer.gov/about-cancer/diagnosis-staging/prognosis/tumor-grade-fact-sheet (last visited Sept. 29, 2020).

because of a sore throat and a non-tender nodule in her right breast that had been present for approximately three days.  (*See* JX 1 at UH006.)  Ms. Avilez was twenty-six years old at the time.  (*Id.*)  PA Pineros saw Ms. Avilez and conducted an exam, including of Ms. Avilez's head, ears, eyes, nose, throat, neck, heart, and lungs, as well as accounting for her general appearance and body-mass index, which did not reveal any abnormalities or items of note.  (JX 1 at UH005.)  The testimony and evidence is unclear as to whether PA Pineros attempted to perform a physical examination in which she could feel or "palpate" the lump that Ms. Avilez reported.  (*See* JX 1 at UH006-07; DaCosta Tr. at 43:21-44:25.)  Regardless, PA Pineros did not make a record of precisely where in the breast the lump about which Ms. Avilez complained was located.  (*See* JX 1 at UH006-07.)  She did inquire about Ms. Avilez's medical history and noted a lack of personal or family history of cancer.  (JX 1 at UH006.)  PA Pineros concluded that the lump was probably a cyst associated with Ms. Avilez's menstrual cycle.  (JX 1 at UH007.)  As such, she told her to follow up with the gynecological department if the lump increased in size or was still present after two to three weeks.  (*Id.*)  She did not, however, return within three weeks.

On February 28, 2015, Ms. Avilez returned to Urban Health complaining about lumps and pain in her right breast and requesting removal of her IUD and a pregnancy test.  (JX 2 at UH004-05.)  She was examined by CNM Santiago.  (*Id.*)  The parties dispute several aspects of what occurred at this visit, including whether Ms. Avilez requested an MRI and whether Ms. Avilez was aware of an ultrasound CNM Santiago ordered.  CNM Santiago testified that, although Ms. Avilez did not come to Urban Health on that day for an annual gynecological examination, in reviewing her medical history prior to seeing her, as is his practice, he noticed that she was due for her annual gynecological exam.  (Deposition of Edwin Santiago, CNM, dated August 14, 2019, Tr. at 10:22-11:14 ("Santiago Dep.").)  Accordingly, CNM Santiago performed certain aspects of a

6

gynecological exam and removed the IUD.  (JX 1 at UH004-05.)  He also conducted a manual exam of Ms. Avilez's breasts.  (JX 1 at UH004.)  He did not feel the lumps about which Ms. Avilez was complaining, noting in the record that her breasts were "nontender" and "no masses [were] appreciated."  (JX 1 at UH004-05.)  CNM Santiago did not request that a doctor on staff examine Ms. Avilez's breast.  (*See id.*)  He did, however, refer Ms. Avilez for a breast ultrasound.  (*Id.*; GX2-001-02.)  Ms. Avilez testified that she requested an MRI but CNM Santiago would not order her an MRI on the ground that she was too young for that procedure, and that CNM Santiago did not order an ultrasound.  (*De Bene Esse* Deposition of Melissa Avilez, dated December 6, 2018, Tr. at 10:5-23 ("Avilez Dep.").)

However, the Court finds that there was an ultrasound referral and that the ultrasound referral was mailed to Ms. Avilez.  (GX2-001-02.)  Ms. Avilez's testimony that there was no referral and that she was not aware of the referral (see Avilez Dep. at 10:16-23) is not credible given the documentary evidence, her apparent confusion during her deposition of what took place during her second versus her third visit to Urban Health, and that she skipped other appointments relating to her breast lump.  (*See, e.g.*, JX 2 at BL008 (record indicating Ms. Avilez advised to return to Bronx Lebanon clinic tomorrow, but she did not), BL043 (missed ultrasound scheduled for November 18, 2015), BL093 (describing missed sonogram, missed breast-clinic appointment, unexplained year-long delay in biopsy).)  Ms. Avilez did not schedule or receive the ultrasound after receiving the referral from CNM Santiago.  (*See* Santiago Dep. at 25:7-16; DaCosta Tr. at 48:1-4).

On May 18, 2015, Ms. Avilez was taken by ambulance to the emergency department at Bronx Lebanon complaining of "anxiety/panic attacks," and a "pop" and "pain" in her "right breast," where she had been feeling "2 balls" for the past two weeks "deep under the areola."

7

(JX 2 at BL006.)  Ms. Avilez recounted to the emergency provider that her gynecologist had not "fe[lt] anything on exam" but that she had been in "bed watching tv and felt a sudden sharp pain in [her] right breast like something popped."  (JX 2 at BL006.)  Ms. Avilez reported the pain to be at a level of two out of ten (or "hurts a little bit").  (JX 2 at BL009.)  An ultrasound (i.e. sonogram) and chest x-ray, both taken and reviewed with Ms. Avilez that same day, showed no cysts or gross masses in the region of clinical concern and were noted as being unremarkable. (JX 2 at BL008, 015-16.)  The medical record indicates that Ms. Avilez said she "fe[lt] well" and was advised to follow up with breast specialists at Bronx Lebanon the following day.  (JX 2 at BL008.)

Ms. Avilez did not return for the breast-related follow-up visit the next day as advised. Instead, she next returned to Bronx Lebanon on June 3, 2015.  (JX 2 at BL018-25.)  At that visit, Ms. Avilez was seen by the Bronx Lebanon emergency department for unrelated complaints concerning vaginal discharge and "lower quadrant pain"—she reported "no chest pain" or any other breast-related symptom.  (JX 2 at BL024.)

Her next medical visit was on June 30, 2015, when she was seen by the surgical department at Bronx Lebanon.  (JX 2 at BL026-33.)  At that visit, Ms. Avilez denied having any trauma to her chest and the medical records noted a lack of any family history of breast or ovarian cancer.  (JX 2 at BL026-33.)  The results of a physical examination indicated the presence of a "tender, firm, mobile" "lump" and "right breast nodule at 12 o'clock 3-4 cm from the nipple line."  (JX 2 at BL029.)  Accordingly, Ms. Avilez was scheduled for a follow-up appointment on July 23, 2015 at Bronx Lebanon.  (JX 2 at BL032.)  Testimony at trial revealed that in most cases, a breast lump needs to be approximately two centimeters in diameter to be felt by a trained medical provider.  (Trial Testimony of Dr. Martin Gubernick, dated August 11, 2020, Tr. at 98:15-18 ("Dr. Gubernick Tr."); Trial Testimony of Dr. Alexander Hindenburg, dated August 12, 2020, Tr.

8

at 8:15-16 ("Dr. Hindenburg Tr."); Dr. Nathenson Tr. at 91:9-10.)

Ms. Avilez did not return to Bronx Lebanon for diagnostic testing of the lump until August

19, 2015, the results of which were interpreted for her during a visit on August 31, 2015.   (JX 2 at

BL035, 038.)

However, before receiving the results of the ultrasound, on August 25, 2015, Ms. Avilez

returned to Urban Health for an "annual gyn exam," this time with CNM DaCosta.   (JX 1 at

UH001.)   CNM DaCosta provided screening and counseling related to sexually-transmitted

infections, as well as a pregnancy test and a general examination.   (JX 1 at UH001-02.)   Ms. Avilez

made no complaints related to her breasts but did inform CNM DaCosta of her pelvic treatment at

Bronx Lebanon, made no mention of her recent ultrasound and breast-related care with Bronx

Lebanon, and CNM DaCosta did not perform a manual breast exam.   (*Id.*; *see also* DaCosta Tr. at

45:23-25, 66:14-69:17.)   When asked at trial why she did not perform a breast exam, CNM

DaCosta stated that she did not believe it to be necessary because CNM Santiago had performed

a breast exam six months prior, (DaCosta Tr. at 45:23-25, 67:18-23), and that it was not

uncommon for a woman to complete her annual gynecological exam over the course of multiple

visits to a gynecological provider.   (DaCosta Tr. at 60:25-612.)   Ms. Avilez testified at her

deposition that she did raise complaints about her breast to CNM DaCosta during this visit and

that she even asked CNM DaCosta for an MRI.   (Avilez Dep. at 13:6-9.)   However, the Court does

not find Ms. Avilez's testimony on these points credible because in her deposition she confused

her second and third visits to Urban Health, as noted above, (see Avilez Dep. Tr. at 33:6-38:7), and

CNM DaCosta credibly testified that any complaints Ms. Avilez made would have been written

down by CNM DaCosta, just as Ms. Avilez's prior complaints about her breast were included in

Urban Health's records, and just as CNM DaCosta noted Ms. Avilez's pelvic treatment at Bronx

Lebanon.  (DaCosta Tr. at 48:14-19; JX 1 at UH001.)

On August 31, 2015, Ms. Avilez went back to Bronx Lebanon to follow up on the ultrasound taken two weeks prior.  (JX 2 at BL034-42.)  During this visit, Ms. Avilez made no new breast-related pain complaints, but for the first time reported that seven months earlier (in January 2015) she had experienced trauma to her right breast from her son's elbow.  (JX 2 at BL035.)  The August 19, 2015 ultrasound showed a mass, in the same 12:00 position just above the nipple, "which corresponds to benign-appearing hyperechogenic breast tissues" consistent with trauma-related inflammation, and did not reveal any "suspicious cystic or solid lesions." (JX 2 at BL038.)  The ultrasound did not indicate the size of the mass.  (*Id.*)  The radiologist's report classified the findings as "BI-RADS 2, BENIGN."[4]  (JX 2 at BL038.)  A grading of BI-RADS 2 corresponds with a benign, non-cancerous finding.  (Dr. Nathenson Tr. at 35:4-20; 40:4-9.)  Ms. Avilez was scheduled for follow-up imaging at Bronx Lebanon on November 16, 2015.  (JX 2 at BL039.)  For reasons that are not clear from the record, she did not return for her scheduled follow-up imaging in November 2015.

The next entry in the medical record is a visit to Bronx Lebanon on March 3, 2016, where Ms. Avilez received another ultrasound.  (JX 2 at BL043.)  A nurse practitioner reviewed the results of the ultrasound with Ms. Avilez on March 8, 2016.  (JX 2 at BL047.)  The nurse practitioner advised Ms. Avilez not to miss any further scheduled appointments.  (*Id.*)  The report indicates that the ultrasound did not reveal any discrete masses, but did show heterogeneous images in the

---

[4]  BI-RADS stands for Breast Imaging Reporting and Data System and sorts mammographic findings into categories numbered from 0 to 6; BI-RADS 2 indicates a negative, benign (non-cancerous) finding; BI-RADS 3 indicates a probably benign finding with roughly a 2 to 8 percent chance of being cancerous; BI-RADS 4 and 5 indicate suspicious or likely malignant masses; BI-RADS 6 indicates that a mass is proven to be cancerous following a biopsy. (Dr. Nathenson Tr. at 35:4-20; 40:4-9.)

breast (i.e. soft and dense masses where only homogeneous tissue should be) that were classified as BI-RADS 3, meaning a probably benign finding with a chance of being malignant, for which a follow-up MRI was recommended.  (JX 2 at BL046.)  Notably, Ms. Avilez's breast were not classified as dense (Dr. Nathenson Tr. at 45:14-22.), meaning that the ultrasound could have picked up a suspicious mass.  (Dr. Nathenson Tr. at 49:18-24.)

On March 21, 2016, an MRI was performed at Bronx Lebanon.  The MRI revealed a "large (4.7 x 4.8 x 6.3 cm) heterogeneous enhancing mass involving the anterior, mid-inner to upper aspect of the right breast." (JX 2 at BL057.)  The findings were classified as BI-RADS 4, meaning most likely malignant.  (*Id.*) Although doctors often refer to tumor size by its largest dimension, utilizing two or three dimensions provides a more accurate description of the size and volume of a tumor.  (Dr. Nathenson Tr. at 46:22-48:10.)  Thus, by March 2016, the mass was slightly greater in size than the five-centimeter threshold associated with worse outcomes.  Ms. Avilez was scheduled for a biopsy at Bronx Lebanon on April 13, 2016—but that biopsy was not performed due to an allergic reaction.  (JX 2 at BL065.)  On April 26, 2016, the biopsy was finally performed, but the report indicates the biopsy did not produce clear images of the mass.  (*Id.*)  As such, Ms. Avilez was scheduled for follow-up visits with the radiological and surgical departments on May 3, 5, and 19, 2016, although it is unclear from the records if these appointments took place. (JX 2 at BL073.)

On July 15, 2016, Ms. Avilez returned to Bronx Lebanon for pre-biopsy procedures and to discuss her possible allergic reaction.  The report from that visit indicates she did not report chest pain and was not in any distress.  (JX 2 at BL080-84.)

The next entry in the record is on March 6, 2017, when Ms. Avilez returned to Bronx Lebanon for a sonogram-guided biopsy, the results of which were discussed at a follow-up visit on

March 16, 2017.  (JX 2 at BL093.)  The report does not explain why the biopsy was delayed for so long, noting only that "[p]atient did not return for more than one year"—it does not make any reference, and no testimony was otherwise provided, as to whether the allergic reaction factored into the length of time between visits.  (*See id.*)  The biopsy results confirmed a diagnosis of angiosarcoma.  (*Id.*)  Ms. Avilez denied having any uncontrolled pain in her breast. (JX 2 at BL093, BL143-144.)

On April 19, 2017, Ms. Avilez underwent a surgical double mastectomy, during which a "rubbery to slightly firm mass measuring 10 x 7.5 x 7 cm," consistent with angiosarcoma, was removed from the right breast.  (JX 2 at BL128.)

Ms. Avilez began radiation therapy in or around August 2017, after which she reported severe pain and discomfort.  (JX 2 at BL124.)  Further imaging in November and December 2017 showed that, despite the double mastectomy in April 2017, her angiosarcoma had metastasized, including in pulmonary nodules, near the uterus, and in the sternum, ribs, and spine. (Dr. Nathenson Tr. at 62:14-63:8 (discussing the "Important Investigations" section of JX 2 at BL140)).)  A bone biopsy taken on December 6, 2017, confirmed the recurrence of the angiosarcoma.  (JX 2 at BL125.)  When seen on December 9, 2017, Ms. Avilez stated that she was "comfortable" and did not have any new complaints or ongoing pain.  (JX2 at BL124.)

On December 27, 2017, an oncologist reviewed Ms. Avilez's file for further evaluation of the state of her angiosarcoma in the wake of the double mastectomy.  This report indicates, among other things, that Ms. Avilez was prescribed oxycodone for cancer-related pain and states, again, that Ms. Avilez had developed metastatic angiosarcoma.  (JX 2 at BL138-43).

Ms. Avilez passed away on January 14, 2019.  (Stip. ¶ 5.)  Ms. Avilez testified that after her double mastectomy in April 2017, she received radiation for five days a week over the course of

three months, and that this treatment significantly decreased her quality of life.  (Avilez Dep. at 13:13-24.)  Ms. Avilez suffered from an inability to sleep, skin burns from radiation treatment, and was unable to take her son to school.  (Avilez Dep. at 14:2-10.)  Following radiation treatment, she began chemotherapy treatments, which left her weak, resulted in loss of her hair and appetite, and prevented her from doing her ordinary everyday activities.  (Avilez Dep. at 14:11-16:3.)  During these treatments, she was given oxycodone and morphine to manage her pain, and was in such pain during her deposition that she was on morphine while giving her testimony and was confined to an in-home hospital bed.  (Avilez Dep. at 16:15-17:3, 18:2-13, 18:19-25; Trial Testimony of Jimmy Viera, dated August 10, 2020, Tr. at 30:19-23 ("J. Viera Tr.").)  Ms. Avilez testified that she had been hospitalized roughly five times following her mastectomy for complications, including a trip to the intensive care unit due to a low platelet count that compromised her immune system.  (Avilez Dep. at 17:13-16.)  From the video, the Court observed visible lumps/tumors on Ms. Avilez's body as a result of the metastasized cancer.  (Avilez Dep. at 20:2-12.)

Mr. Viera testified that Ms. Avilez lost roughly one hundred pounds during her two-year treatment period and had significant hip pain during this time.  (J. Viera Tr. at 30:1-12.)  Prior to her diagnosis, Ms. Avilez testified she was an active person, which Mr. Viera corroborated.  (Avilez Dep. at 19:12-25; J. Viera Tr. at 29:3-5.)  Ms. Avilez spent a considerable amount of time with her son, taking him to school, to a toy store every Friday, to the park, to the barbershop, dancing with him in their living room, and often helping him with his homework—much of which she was unable to do after her diagnosis.  (Avilez Dep. at 14:3-4, 15:25-16:3, 19:15-25; Trial Testimony of Aizak Viera, dated August 10, 2020, Tr. at 24:17-25:4 ("A. Viera Tr."); J. Viera Tr. at 27:11-28:16.)

## CONCLUSIONS OF LAW

Under the FTCA, a plaintiff's claims against the United States are to be construed under the substantive law of the state in which the tort occurs. *See Gonzalez v. United States*, --- F. Supp. 3d ---, No. 17-cv-3645, 2020 WL 1548067, at *7 (S.D.N.Y. March 31, 2020). It is undisputed between the parties that the substantive law of New York applies in this case. Under New York law, there are three elements of a medical malpractice claim. First, there must be an existence of a duty of care owed by the medical provider to the plaintiff/patient. *See Burtman v. Brown*, 945 N.Y.S.2d 673, 677 (1st Dep't 2012). Second, the defendant must have breached the standard associated with that duty of care. *See Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (collecting New York cases). And finally, the breach of that duty must have proximately caused the plaintiff's injuries. *Id.* A plaintiff bears the burden of establishing each element of her claim by a preponderance of the evidence, which for medical malpractice, requires competent medical expert testimony for all issues beyond the competence of a lay person. *Dentes v. Mauser*, 937 N.Y.S.2d 409, 411 (3d Dep't 2012) (quotations and citation omitted); *Rodriguez v. Saal*, 841 N.Y.S.2d 232, 236 (1st Dep't 2007); *see also Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (expert testimony required "unless the alleged act of malpractice falls within the competence of [the factfinder] to evaluate"). Where "a plaintiff claims that a [medical provider's] acts or omissions decreased his or her chances of survival or cure, there is legally sufficient evidence of causation as long as the jury can infer that it was probable that some diminution" in survival occurred. *Gonzalez*, 2020 WL 1548067 at *5 (quoting *Mi Jung Kim v. Lewin*, 108 N.Y.S.3d 25, 27 (2d Dep't 2019)). Under this doctrine, a medical malpractice plaintiff may "recover damages for the reduction in the odds of recovery attributable to a defendant, even when that reduction is less than fifty percent." *Mann v. United States*, 300 F. Supp. 3d 411, 422-23 (N.D.N.Y. 2018)

14

(quoting *Crosby v. United States*, 48 F. Supp. 2d 924, 926 (D. Alaska 1999) (internal quotation marks omitted)).  While the New York Court of Appeals has yet to endorse the diminution in survival doctrine, lower New York courts have generally held that such claims may proceed so long as a plaintiff can show that the defendant was a "substantial factor" in depriving her of a substantial possibility of recovery.  *See D.Y. v. Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d 368, 371 (3d Dep't 2017); *Clune v. Moore*, 142 A.D.3d 1330, 1331 (N.Y. App. Div., 4th Dep't 2016) (requiring plaintiff to show that "there was a substantial possibility that the patient was denied a chance of the better outcome as a result of the defendant's deviation from the standard of care"); *Candia v. Estepan*, 734 N.Y.S.2d 37, 38 (1st Dep't 2001).  However, if a plaintiff cannot establish that a duty of care existed as a threshold matter, the claim cannot succeed, and any expert testimony regarding the appropriate standard of care or causation is irrelevant.  *See Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 (2d Cir. 2018) ("A medical malpractice defendant is *prima facie* entitled to summary judgment if it demonstrates that it did not depart from good and accepted medical practice . . . .")

**A.** **Liability**

Ms. Avilez visited Urban Health on three occasions relevant to this litigation.  Each health provider who treated her owed her a duty to treat her according to the applicable standard of care.  The Government could incur liability if any of the three medical professionals Ms. Avilez visited with breached a standard of care owed to her.  For that reason, each visit will be assessed separately.

1. *The First Two Urban Health Visits*

On December 16, 2014, Ms. Avilez went to Urban Health with complaints of a sore throat and a "non-tender nodule on the right side of breast" for the past three days.  (JX 1 at UH006.)  PA

Pineros's notes in the medical record indicate she advised Ms. Avilez that cysts can appear during the menstrual cycle that often dissipate but that she should follow up with the gynecological department if the mass got bigger or persisted for two or three more weeks.  (JX 1 at UH007.)  PA Pineros was not called to provide testimony at trial.

Plaintiff argues that PA Pineros's failure to refer Ms. Avilez to a breast surgeon or doctor was a deviation from the standard of care.  In support of this argument, Plaintiff offered the expert testimony of Dr. Gubernick, a duly licensed physician in the state of New York, with board certifications in the specialty of obstetrics and gynecology.  (Dr. Gubernick Tr. at 86:23-87:9.)  Dr. Gubernick testified at trial that PA Pineros deviated from good and acceptable medical practice because Ms. Avilez presented with a non-tender nodule, which is inconsistent with a cyst, and should have therefore been referred to a physician, as opposed to being told to follow up with additional care if the mass persisted.  (Dr. Gubernick Tr. at 90:10-91:3.)  The Government presented the testimony of CNM DaCosta, a duly credentialed CNM in the state of New York, trained under the standards of the American College of Gynecology.  (DaCosta Tr. at 57:2-21.)  CNM DaCosta testified that PA Pineros did not deviate from any standard of care in referring Ms. Avilez to the gynecology department at Urban Health should the issue persist, as opposed to a gynecological physician, because Ms. Avilez's young age, lack of a personal or family history with cancer, and newness of her complaints were consistent with "a nonurgent referral."  (DaCosta Tr. at 51:25-52:2; 59:20-23.)

I find that Plaintiff did not establish, by a preponderance of the evidence, a standard of care in which a medical professional in PA Pineros's position would be required to immediately refer a twenty-six-year-old patient who complained of a non-tender module with no personal or family medical history of cancer to a physician.  As CNM DaCosta testified, CNMs are trained to

handle gynecological consultations without physicians, and even though PA Pineros did not immediately refer Ms. Avilez to a breast specialist, she did advise Ms. Avilez to follow up with the gynecological department, a specialty department, should the issue persist for more than two or three weeks. (DaCosta Tr. at 51:25-52:3; *see also* JX 1 at UH007.) I further find that PA Pineros did not deviate from accepted medical care when she advised Ms. Avilez to self-monitor the breast lump. Breast pain and lumps are not atypical complaints and are not necessarily associated with cancerous nodules, especially in women of Ms. Avilez's age and personal and family history. (DaCosta Tr. at 58:7-12; Dr. Nathenson Tr. at 69:7-15.) Although Dr. Gubernick did opine that Ms. Avilez should have been referred to a doctor or specialist, he did not specify the timing of such a referral. CNMs are competent and trained to examine breasts and to order initial screening tests such as an ultrasound and, in fact, are licensed by the state to do such. (*See* DaCosta Tr. at 56:24-57:21.) I find that the standard of care in this instance did not require immediate referral to a physician, let alone a breast surgeon, in light of Ms. Avilez's symptoms, age, and medical history.

Furthermore, I find that Plaintiff has not met his burden in demonstrating that any lump Ms. Avilez felt in December 2014 was the start of her angiosarcoma. I find this because there is no dispute that angiosarcoma grows quickly (Dr. Nathenson Tr. at 22:14-15), there was no palpable mass found by CNM Santiago on February 28, 2015 (see *infra*), and Dr. Nathenson's testimony persuaded this Court that it is unlikely that the cancer started in 2014 (Dr. Nathenson Tr. at 67:18-69:11.); *see also* Dr. Hindenburg Tr. at 7:19-21, 17:14-16 (testifying the cancer was most likely first palpable in April 2015).) It is more likely that the lump she felt was a cyst at this time, because as of late February 2015, no lump was palpable, suggesting it went away. (JX 1 at UH004.) And, notably, Ms. Avilez did not return to Urban Health in three weeks, suggesting the

lump went away.  Similarly, in May 2015, Ms. Avilez reported having felt "2 balls" in her breast for only two weeks, suggesting any lump she felt in late 2014 or early 2015 went away and new lumps appeared in late April or May 2015.  (JX 2 at BL006.)  Therefore, I find that Urban Health has no liability with respect to Ms. Avilez's December 16, 2014 visit with PA Pinero.

On February 28, 2015, Ms. Avilez returned to Urban Health with complaints of right-breast mastalgia, specifically, of "lumps and slight aching pains."  (JX 1 at UH004.)  CNM Santiago testified that upon reviewing her available medical record, he determined that Ms. Avilez was due for an annual gynecological exam, which he conducted during this visit.  (Santiago Dep. at 10:22-11:14.)  CNM Santiago performed a manual exam on Ms. Avilez, noting that her breasts appeared normal: "symmetrical, nontender, no masses appreciated, no nipple discharge."  (JX 1 at UH004.)  He described the results of the examination to be "without abnormal finding."  (*Id.*)  Nonetheless, CNM Santiago referred Ms. Avilez for an ultrasound given Ms. Avilez's complaint about a lump.  (JX 1 at UH004-05.)  Ms. Avilez had notice of this referral because it was mailed to her.  (GX2-001-02.)

At trial, Plaintiff offered the testimony of Dr. Gubernick in an attempt to establish a standard of care that CNM Santiago breached.  Dr. Gubernick testified that the standard of care owed to a patient who "has a persistent mass," complained of twice in a little over two months, requires a referral to a physician, who "would have ordered an MRI."  (Dr. Gubernick Tr. at 93:18-94:5.)  He stated that the principal reason for ordering an MRI is because young women tend to have dense breasts, which are harder to image by ultrasound.  (Dr. Gubernick Tr. at 92:2-13.)  He conceded, however, that an ultrasound is also an appropriate first step.  (Dr. Gubernick Tr. at 116:18-24.)  Plaintiff's counsel presented testimony that, had an ultrasound been conducted, and had the results been negative, CNM Santiago would still not have been able to rule out breast

18

cancer.  (Santiago Dep. at 31:8-10; *see also* Dr. Gubernick Tr. at 93:10-13.)  Dr. Gubernick also testified that CNM Santiago had a duty to follow up with Ms. Avilez after she missed the ultrasound appointment.  (Dr. Gubernick Tr. at 95:5-8.)  Dr. Gubernick did not say how much time would need to pass for the duty to follow-up to arise.  Plaintiff did not meet his burden of establishing that CNM Santiago breached a duty of care to Ms. Avilez.

Courts in this Circuit have faulted plaintiffs for failing to schedule appointments at the advice of their medical providers when those failures may have contributed to the ultimate injury. *See Morgan v. United States*, 1988 WL 138404 (E.D.N.Y. 1988) (holding a plaintiff contributorily negligent for delay in diagnosis of Hodgkin's disease due to plaintiff's failure to ensure a C.A.T. scan was performed despite the referring doctor's instruction to patient to take action if no contact was made by doctor's hospital within the month), *judgment rev'd on other grounds*, 1991 WL 353371 (E.D.N.Y. 1991), *aff'd on other grounds and remanded*, 968 F.2d 200 (2d Cir. 1992). Consistent with this case law, I find that Plaintiff did not establish by a preponderance of the evidence that CNM Santiago had an obligation to chase down Ms. Avilez to get an ultrasound. Rather, consistent with what CNM Santiago testified, an obligation arises once the ultrasound report comes back, at which time he would have reviewed the results with the patient.  (Santiago Dep. at 25:22-26:8.)

I also find that Plaintiff did not establish by a preponderance of the evidence that CNM Santiago had an obligation to order an MRI or immediately refer Ms. Avilez to an OB/GYN or breast surgeon.  This finding is supported by the testimony of Dr. Nathenson, who testified that the appropriate test to be ordered for Ms. Avilez was an ultrasound.  (Dr. Nathenson Tr. at 69:16-18.)  His opinion was based on his review of the symptoms Ms. Avilez presented with on the day of her visit and that cancer and angiosarcoma typically present as a painless mass, not one with

aching pain.  Plaintiff's expert, Dr. Gubernick, also conceded that an ultrasound is an appropriate first test.  (Dr. Gubernick Tr. at 116:18-24.)  The Court's finding is also supported by the fact that CNM Santiago did not palpate a mass that "would correlate" with Ms. Avilez's complaints of breast lumps.  (Dr. Nathenson Tr. at 69:3-15, 70:4-6.)  The conclusion that an ultrasound was an appropriate first test is supported by Dr. Nathenson's testimony that ultrasounds can detect angiosarcoma and are usually the first imaging test,  (Dr. Nathenson Tr. at 12:7-20, 116:21-23), as well as his testimony that based on his review of Ms. Avilez's medical records, she did not have dense breasts (Dr. Nathenson Tr. at 45:14-22; *see also* JX 2 at BL057).  In other words, an ultrasound should have been able to detect a suspicious mass of at least two centimeters.[5] Had CNM Santiago felt a lump or had the ultrasound detected a suspicious mass, then a duty would arise to follow up with an MRI and refer Ms. Avilez to a specialist.

Although the Government did not dispute that MRIs are superior to ultrasounds for locating breast lumps that are very small in size (under two centimeters) and in dense breasts, an MRI, which is a more invasive and expensive test, typically follows the ultrasound, especially in a young patient with no family history of breast cancer like Ms. Avilez—a demographic that does not typically develop breast cancer.  (Dr. Gubernick Tr. at 92:2-4; Dr. Nathenson Tr. at 95:1-3, 116:21-23.)  The Court also takes into account that Plaintiff's experts were not radiologists or experts in angiosarcoma and rendered opinions about an MRI being the appropriate test to have ordered based on breast density assumptions that were not true for Ms. Avilez. (Dr. Gubernick Tr.

---

[5]  Based on the fact that a breast lump generally needs to be two centimeters to palpate, if there were a lump present, it would have been less than two centimeters, because CNM Santiago could not feel it.  (Dr. Gubernick Tr. 98:15-18; Dr. Hindenburg Tr. at 8:15-16; Dr. Nathenson Tr. at 91:9-10; *see also* JX 1 at UH004 (indicating CNM Santiago did not appreciate any mass).)

at 101:17-102:9; Dr. Hindenberg Tr. at 18:10-20:21).

Finally, I find that Plaintiff has not met his burden in demonstrating that any lump or pain Ms. Avilez felt in February 2015 was the start of her angiosarcoma.  I find this because pain is not normally associated with breast cancer, which was what Ms. Avilez complained about in February 2015 (JX 1 at UH004 ("slight aching pains")), because no mass was palpated (*Id.* ("no masses appreciated")), because in May 2015 Ms. Avilez reported feeling two lumps for about two weeks (suggesting any prior lumps had gone away) (JX 2 at BL006), and because a May 2015 ultrasound found no suspicious masses (JX 2 BL008, 015-16).  Ms. Avilez's complaints of breast lumps and slight aching pains in her right breast were more likely caused by her son's elbow in January 2015 than by the development of angiosarcoma.  (*See* JX 2 at BL038 (medical record of Ms. Avilez's August 19, 2015 visit with Bronx Lebanon bearing first note in medical record that Ms. Avilez suffered elbow trauma from her son in January 2015); Dr. Nathenson Tr. at 11:11-17 (primary angiosarcoma typically presents as a painless mass).)  Thus, the standard of care, given Ms. Avilez's medical history at Urban Health and the symptoms she presented with during her visit with CNM Santiago, called for an ultrasound without the need for referral to a physician—a standard that CNM Santiago met.   Therefore, I find that the Government incurs no liability as a result of Ms. Avilez's February 28, 2015 visit with CNM Santiago.

2. *The August 24, 2015 Visit to Urban Health*

On August 24, 2015, Ms. Avilez returned to Urban Health for the third time.  This time she was seen by CNM DaCosta, who indicated that Ms. Avilez was there for an annual gynecologic examination.  (JX 1 at UH002.)  Ms. Avilez did not make any complaints during this visit regarding her right breast, and CNM DaCosta did not otherwise elicit any information regarding Ms. Avilez's right-breast pain or masses, nor did she perform a physical exam of Ms. Avilez's breasts.

21

However, CNM DaCosta acknowledged that persistent complaints of breast lumps require follow up.  (DaCosta Tr. at 48:1-13.)

          *(i)*       ***Standard of Care***

The parties offered conflicting testimony over the appropriate standard of care during this visit.  Plaintiff again offered Dr. Gubernick's expert testimony to argue the relevant standard of care required a physical breast examination at this visit and that CNM DaCosta did not meet this standard.  (Dr. Gubernick Tr. at 96:7-10.)  Dr. Gubernick explained that, given the two prior complaints Ms. Avilez made during Urban Health visits, and given the ultrasound that was ordered but never conducted, something more than a routine annual breast examination was required.  (Dr. Gubernick Tr. at 96:12-23.)  He further testified that the ultrasound should have been reordered and that a referral to a physician should have been made, and that such a referral would have led to an MRI.  (*Id.*)

The Court finds that Plaintiff's evidence was more persuasive on the standard of care at the third visit and that he has proved that CNM DaCosta breached the standard of care by a preponderance of the evidence.  CNM DaCosta should have seen in Urban Health's records that in her last two visits, Ms. Avilez complained about breast lumps and pain, and that an ultrasound had been ordered but not conducted.  CNM DaCosta should have inquired about breast lumps and pain and also should have conducted a follow-up breast exam given Ms. Avilez's personal history of complaints and the time that had passed since her last visit to Urban Health.  The Government offered no persuasive evidence to counter this standard of care.  The fact that an annual breast exam was given by CNM Santiago did not excuse CNM DaCosta from following up, especially when CNM Santiago had been concerned enough to order diagnostic imaging.  In other words, just as CNM Santiago recognized that Ms. Avilez needed her annual exam even though she

did not initially come to Urban Health for that purpose, CNM DaCosta should have provided continuity of care and followed up on the breast complaints and missed ultrasound.  Therefore, I find that Plaintiff has shown by a preponderance of evidence that CNM DaCosta breached the standard of care owed to Ms. Avilez.  However, Plaintiff did not meet his burden in showing that CNM DaCosta's failure to order an MRI was a breach of the standard of care given that no ultrasound had yet been performed and, for the reasons set forth above, an ultrasound is an appropriate first diagnostic test.

### (ii)    Proximate Cause

The next question in the analysis is whether CNM DaCosta's breach proximately caused injury to Ms. Avilez—here, defining injury as a significant decrease in Ms. Avilez's chance of surviving angiosarcoma.  Under a loss-of-chance theory, a plaintiff may show proximate cause by proving that the defendant "'diminished [the patient's] chance of a better outcome or increased the injury.'"  *Gonzalez,* 2020 WL 1548067 at *5 (quoting *Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d at 371); *see also Mi Jung Kim*, 108 N.Y.S.3d at 27.  To be the proximate cause of injury under New York negligence law, the plaintiff must show that the defendant's breach of duty of care is "a substantial cause of the events which produced the injury."  *Mann*, 300 F. Supp. 3d at 419 (quoting *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016)).  For medical malpractice claims, expert testimony is required to establish the elements of a negligence claim, including causation, unless the "evidence [is] readily understandable to an average juror."  *Dentes*, 937 N.Y.S.2d at 411; *see also Gonzalez,* 2020 WL 1548067 at *5.

#### a)   Intervening Factors

In medical malpractice suits in which defendants raise an intervening act defense, when a plaintiff sees doctors from two different medical providers, the standards of care may shift from

the initial doctor to the subsequent, more specialized doctor.  *See Burtman v. Brown*, 945 N.Y.S.2d 673, 676 (1st Dep't 2012) (finding fault in the trial court's imposition of duty of care on initial, primary care defendant doctor for the reasons that she was plaintiff's primary care doctor, saw the plaintiff first, and reviewed a radiology report taken by the specialists defendant referred plaintiff to, when the primary care doctor did not otherwise treat or have reason to be aware of plaintiff's abdominal mass).  However, just because a plaintiff sees doctors at multiple locations, and just because the plaintiff progressed from an initial, primary care physician to a more specialized doctor, does not automatically mean that the less specialized medical provider ceases to owe a duty of care.  *See, e.g.*, *Leigh v. Kyle*, 39 N.Y.S.3d 45 (2d Dep't 2016) (in a case in which the primary care physician admitted plaintiff to a hospital, and testified that she continued to be responsible for coordinating the plaintiff's course of treatment, the court held that a subsequent, specialized neurosurgeon did not incur a duty of care based on a single consultation or any other duty to supervise or participate in plaintiff's treatment).  Relatedly, "[w]hen a question of proximate cause involves an intervening act, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence."  *Id.* at 420.  The New York Court of Appeals has noted that "the mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because there may be more than one proximate cause of an injury."  *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016) (alterations and quotations omitted).

The Government argued that Bronx Lebanon's involvement with Ms. Avilez's breast complaints, beginning in May 2015, breaks the causal chain between Ms. Avilez and Urban Health such that any breach of a standard of care by CNM DaCosta cannot be said to have proximately caused Ms. Avilez's injury.  In *Burtman v. Brown*, a plaintiff brought suit against several medical

24

providers, including a primary care physician and West Care, "a rotating group obstetrical practice," for failing to timely diagnose an abdominal mass as a benign atypical lipoma. 945 N.Y.S.2d at 674. The plaintiff saw West Care doctors throughout her pregnancy and saw her primary care physician twice during her pregnancy—once for a "full checkup" and "physical examination" and once for a sprained ankle. *Id.* at 675. The primary care physician also received and reviewed a radiology report from West Care after conducting the full checkup and before seeing the plaintiff for her sprained ankle. West Care ordered the radiological exam after detecting a palpable abdominal mass. The trial court found that the primary care doctor had a duty of care to have identified the palpable mass during the full checkup and to follow up with the plaintiff about the radiological report when she later saw the plaintiff for the sprained ankle and breached her duty both times. *Id.* at 676. The Appellate Division reversed the decision of the trial court, finding the trial court erred by imposing a duty of care in both instances. Regarding the first visit, it held that the primary care physician owed no duty to plaintiff because the trial court assumed the mass was present despite insufficient medical testimony to support that assumption. Regarding the second visit, it held no duty was owed because the primary care physician was not responsible for treating a mass she had not diagnosed simply by virtue of having reviewed an unsolicited radiology report, especially given that the West Care doctors referred the plaintiff to a different specialist for further treatment of the mass. *Id.* at 676-77. And further, the West Care doctor who sent the radiology report to the primary care physician made a notation on the report that the results had already been discussed with the plaintiff.

Unlike the primary care doctor in *Burtman*, Urban Health was treating Ms. Avilez for her breast complaints and had even ordered an ultrasound before she ever saw a doctor at Bronx Lebanon. Also unlike the primary care doctor in *Burtman*, where another medical provider had

ordered the test and discussed it with the plaintiff, Urban Health had no knowledge that any

other specialist was treating Ms. Avilez for her breast lumps (*see* DaCosta Tr. at 66:18-67:10.)

Thus, Urban Health had a continuing duty of care to follow up on any past complaints Ms. Avilez

had made concerning her breasts.  None of the cases the government has cited hold otherwise.

Given that CNM DaCosta was unaware of Bronx Lebanon's treatment, and given that Urban

Health was treating Ms. Avilez for her breast complaints and had a duty to follow-up on her prior

complaints, I find that Bronx Lebanon's course of treatment with Ms. Avilez does not operate to

prevent Urban Health from having assumed a duty of care over Ms. Avilez's breast mass or from

incurring liability for medical malpractice.

b) <u>Causal Chain</u>

Having determined that Bronx Lebanon's treatment of Ms. Avilez does not absolve Urban

Health of potential liability, the Court next addresses whether CNM DaCosta's breach was a

significant factor and proximately caused Ms. Avilez to suffer a loss in chance of survival.  Here,

the causal chain leads to the conclusion that CNM DaCosta's failure to conduct a physical exam

and follow-up on the missed ultrasound proximately caused Ms. Avilez to suffer a loss of chance

of surviving her cancer.

First, Plaintiff has shown by a preponderance of the evidence that Ms. Avilez's cancer was

present in August 2015.  Plaintiff offered the opinion of Dr. Hindenburg to establish when Ms.

Avilez's cancer would have first been detectable.  Dr. Hindenburg testified that, in his opinion, the

cancer was detectable by MRI as early as April 2015, two years prior to the double mastectomy.

(Dr. Hindenburg Tr. at 7:12-21, 8:15-9:1.)  An MRI can detect cancers that are smaller than two

centimeters.  (*Id.*)  Although Defendant's oncology expert, Dr. Nathenson, opined that the cancer

most likely was not present earlier than September 2015, he admitted that he could not say this

26

to a medical degree of certainty. (Dr. Nathenson Tr. at 21:6-16, 76:16-77:1, 81:10-17.)  Other

evidence supports the Court's conclusion that Ms. Avilez's cancer was detectable in August 2015.

For example, the May 2015 exam by Bronx Lebanon located a breast nodule in Ms. Avilez's right

breast at "12 o'clock 3-4 cm from the nipple line."  (JX 2 at BL026-29.)  As noted above, this means

that there was a lump present of at least two centimeters at that time. (Dr. Gubernick Tr. at

98:10-18; Dr. Hindenburg Tr. at 8:15-16; *see also* Dr. Nathenson Tr. at 91:9-10.)  Based on the

testimony of the various doctors and other records discussed above, this Court finds that it is

likely that the tumor was quite new in May 2015 and not more than two centimeters.  Bronx

Lebanon records show that the lump persisted and could be palpated in August 2015—the same

month that Ms. Avilez saw CNM DaCosta.  This means that CNM DaCosta would have felt the

lump had she performed a breast exam on Ms. Avilez, which would have led her to reorder the

ultrasound given that Ms. Avilez had missed the ultrasound ordered by CNM Santiago and that

the lump was palpable (whereas it was not when CNM Santiago examined Ms. Avilez).

Plaintiff also has shown by a preponderance of the evidence that, had CNM DaCosta

ordered an ultrasound, it would have detected a suspicious mass that would have led to an earlier

diagnosis.  Several pieces of evidence support this conclusion.  First, the August 2015 ultrasound

taken at Bronx Lebanon showed a "palpable area" in the "12:00 position, 2 cm from the nipple"

and "hyperchogenic breast tissue" that the radiologist interpreted as inflammation.  (JX 2 at

BL058.)  The radiologist reading the report rated the findings as BI-RADS 2.  (Id.)  However, there

is evidence in the record that another radiologist may have interpreted the image as a Bi-RADS 3

requiring a follow-up MRI.  The Government's own experts acknowledged that radiology readings

are subject to differing interpretations, and one radiologist may determine a particular mass to be

BI-RADS 3 while another may determine the same image to indicate BI-RADS 2.  (Dr. Hoda Tr. at

164:3-21; Dr. Nathenson Tr. at 86:10-21.)  Further, the ultrasound CNM DaCosta would have

ordered would have taken place in September 2015, as her exam was at the end of August 2015.

Plaintiff's experts credibly testified that the tumor was present in August 2015, and even the

Government's expert conceded that the tumor could have been detected in September 2015 or

earlier.[6]  (Dr. Nathenson Tr. at 12:7-20, 21:3-13)  The Government's expert also testified, as noted

above, that the tumor was aggressive and grew quickly. Thus, any mass seen in the August 2015

ultrasound would have been larger and more visible in a September 2015 ultrasound and, more

likely than not, would have resulted in a BI-RADS 3 rating, requiring a follow-up MRI.  (*See*

DaCosta Tr. at 63:22-64:6; Dr. Gubernick Tr. at 92:19-23; Dr. Nathenson Tr. at 12:7-20, 45:11-22.)

Such an MRI would have occurred in October or November 2015, which surely would have led to

an earlier diagnosis of the tumor.

Even assuming the cancerous growth started in September 2015, an ultrasound conducted

that month could have detected an angiosarcoma as small as one and a half centimeters.  (*See* Dr.

Nathenson Tr. at 116:18-118:3.)  However, because there was a palpable mass in May 2015, the

tumor had likely grown in size to about three centimeters by September 2015, given its aggressive

growth rate, the size a tumor has to be to be felt by an examiner, and its size in March 2016,

which was slightly more than five centimeters.[7]  (Dr. Hoda Tr. at 158:12-21, 187:2-8;

Dr. Nathenson Tr. at 22:14-15; 50:6-12, 58:7-15.)  Although Plaintiff's expert opined that the

tumor was five centimeters in November 2015 because it was two centimeters in the beginning of

_____

[7]  Plaintiff's suggestion that the tumor was present before April 2015 based on a linear growth rate was not
supported by a preponderance of the credible evidence.  Rather, the evidence established that angiosarcomas are
not subject to linear growth rates.  (Dr. Hoda Tr. at 187:2-8; Dr. Nathenson Tr. at 58:7-15.)

2015, the Court is not persuaded that this is so. Plaintiffs' experts based their conclusions on simple math, not the attributes of Ms. Avilez's specific tumor, and without the benefit of Bronx Lebanon records discussed above supporting the conclusion that the tumor started in the late Spring of 2015. Further, the testimony of Dr. Hoda and Dr. Nathenson, both of whom examined Ms. Avilez's specific records and who are more knowledgeable about the pathology and likely growth rates of Ms. Avilez's tumor, support a conclusion that the growth rate of the tumor is not linear and that the tumor likely appeared and was under five centimeters during all of 2015 and possibly through February of 2016. All of the above evidence supports the Court's finding that the tumor was between three and five centimeters in size in the September 2015 through February 2016 time frame and that DaCosta's breach of her duty of care was a proximate cause in the delayed diagnosis.

### c)   Significant Factor in Causing Injury

However, it is not enough that the cancer would have been present in September 2015 and that CNM DaCosta's failure to act is an actual cause of Ms. Avilez's injury for Plaintiff to prove the Government's liability. To prevail on the causation element, Plaintiff must show the but-for act(s)/omission(s) significantly contributed to a loss of chance of survival. *See Mann*, 300 F. Supp. 3d at 419; *Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d at 371.

Plaintiff has proven by a preponderance of the evidence that the chance of survival from angiosarcoma is greater when the tumor is detected at a size smaller than five centimeters. Plaintiff's expert testified to this, as did the Government's experts. (Dr. Hindenburg Tr. at 10:20-11:2; Dr. Hoda Tr. 162:3-8; Dr. Nathenson Tr. 99:8-100:21.) Dr. Nathenson opined that the five-year-overall-survival rate for angiosarcoma patients—meaning the chances that a patient is alive five years after diagnosis, regardless of the state of remission—is between 50 and 60 percent,

with one source he relied on putting the figure at 59 percent and another at 61 percent.

(Dr. Nathenson Tr. at 91:25-93:1.)  The survival rate decreases as the tumor gets larger.

(Dr. Nathenson Tr. at 121:5-23.)  This testimony provides a firm basis upon which to conclude that

had Ms. Avilez's cancer been detected through ultrasound or MRI conducted in the fall of 2015

when the tumor was less than five centimeters, she would have had a better chance of survival.

*See Gonzalez*, 2020 WL 15480 at *5 (quoting *Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d at 371).

Therefore, I find that CNM DaCosta's failure to conduct a manual exam was a breach of

the standard of care Urban Health owed to Ms. Avilez, and that this breach proximately caused

Ms. Avilez to suffer a significant loss in her chance to survive the cancer.

3.    *Ms. Avilez's Comparative Negligence*

This finding does not end the Court's inquiry.  New York is a pure comparative negligence

state, meaning there can be more than one proximate cause of an injury.  *See Dershowitz v.*

*United States*, No. 12-cv-08634 (SN), 2015 WL 1573321, at *29 (S.D.N.Y. Apr. 8, 2015).  The

controlling statute for comparative negligence reads as follows:

> In any action to recover damages for personal injury, injury to property, or
> wrongful death, the culpable conduct attributable to the claimant or to the
> decedent, including contributory negligence or assumption of risk, shall not bar
> recovery, but the amount of damages otherwise recoverable shall be diminished
> in the proportion which the culpable conduct attributable to the claimant or
> decedent bears to the culpable conduct which caused the damages.

N.Y.C.P.L.R. 1411.  Thus, while a plaintiff's contribution to her injury will not bar recovery, it will

diminish her recovery proportionally.  *See id.*; *see also Goodlett v. Kalishek*, 223 F.3d 32, 35-36 (2d

Cir. 2000).  However, a defendant must prove any negligence on the part of the plaintiff by a

preponderance of the evidence.  *See Kane v. United States*, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002)

(citing N.Y. Pattern Jury Instr.—Civil 2:275.1).  In a medical malpractice case, a plaintiff can be held

completely or partially responsible for the ultimate injury about which he or she complains.  For

example, a plaintiff who chose to forego traditional surgical options, as advised by an oncologist,

in lieu of an alternative nutritional treatment, as advised by defendant, was held 49 percent liable

for the injury proximately caused by the defendant, because the jury determined that "the

plaintiff impliedly accepted a substantial part of the risk entailed by the alternative protocol."

*Charell v. Gonzalez*, 673 N.Y.S.2d 685, 686-87 (1st Dep't 1998).

The Court finds that the Government has met its burden of showing that Ms. Avilez's own

negligence also contributed to and was a proximate cause of her delayed diagnosis by a

preponderance of the evidence.  First, Ms. Avilez missed the follow-up ultrasound ordered by

Bronx Lebanon for November 18, 2015, scheduled during an August 31, 2015 visit.  (JX 2 at

BL041.)  This is a particularly crucial date, because, as discussed above, the tumor would have

been detectable by ultrasound in September 2015, meaning that an ultrasound in November

surely would have revealed the malignancy, and the tumor was under five centimeters at that

time.  Dr. Nathenson testified credibly that missing this November 2015 scheduled ultrasound

was a significant factor in the delayed diagnosis of Ms. Avilez's angiosarcoma.  (Nathenson Tr. at

49:18-24.)

The Government also pointed to the seven-month period between July 2016 and March

2017 in which Ms. Avilez failed to return to Bronx Lebanon for another biopsy and surgery.  This,

again, is a crucial period, because in this time period, the tumor grew rapidly, as evidenced by its

massive size (ten centimeters) at the time of removal.  Ms. Avilez's failure to return for the biopsy

and surgery for nearly a year is solely attributable to Ms. Avilez—not Urban Health.  However,

because the focus of the injury is on the delayed diagnosis, the missed ultrasound in November

2015 plays a greater role in the Court's comparative negligence analysis than this later seven-

month period.  Survival rates are on a continuum, however, with survival decreasing as tumor size

increases.  (Dr. Nathenson Tr. at 121:5-23.)

Had Ms. Avilez attended her November 2015 ultrasound, the same causal chain discussed

above that would have occurred had CNM DaCosta conducted a breast exam would have taken

place.  Put differently, had Ms. Avilez gone to her November 2015 ultrasound, Bronx Lebanon

would have detected the tumor before it was five centimeters and when Ms. Avilez had a better

chance of survival.  And, had she acted more quickly to obtain appropriate biopsies and surgery

after receiving the March 2016 ultrasound results showing a likely malignancy, her tumor would

have been extracted when it was less than ten centimeters and closer to five centimeters, again,

bettering her chance of survival.  Based on this evidence, I find that Ms. Avilez contributed to her

own loss in chance of survival in an amount equal to Urban Health's negligence.  Accordingly, I

find that her omissions caused 50 percent of her injury.  As such, any award of damages to

Plaintiff will be limited to the amount attributable to Urban Health.

### B.    Damages

Plaintiff seeks three types of damages.  Plaintiff seeks $2 million for Ms. Avilez's conscious

pain and suffering and the loss of enjoyment of life based on the twenty-two months between her

delayed diagnosis and death.  Second, on behalf of Aizak Viera, Ms. Avilez's son, Plaintiff seeks an

additional $2 million for the loss of parental guidance.  Third, Plaintiff seeks lost earnings and lost

household services, which the parties have stipulated, in the event the Government has liability,

to $79,520 and $158,020, respectively, for a total of $237,540 in economic damages.  (*See* Stip.

¶ 5.)  And finally, Plaintiff seeks reimbursement of legal fees and costs associated with the

prosecution of this litigation.

The Government argued that Ms. Avilez did not experience consistent pain and suffering

during her entire twenty-two-month-treatment period preceding her death and that damages awarded in similar cases are less in any event.  The Government directed the Court to two cases, both of which involved a roughly two-year period between diagnosis and death, one in which the court awarded less than $1 million and another when the court awarded $1.25 million.  *See Gonzalez*, 2020 WL 1548067 at *8 (awarding $850,000 for two-year period in case involving a ten-month delay in diagnosis, attributable to malpractice without contributory negligence, for lung cancer); *Mann*, 300 F. Supp. 3d at 421 (awarding $1.25 million for twenty-month period in case involving a thirty-eight month delay in diagnosis, attributable to malpractice without contributory negligence, for a lung cancer).  Neither of these cases considered whether the pain was constant or not.

"Generally, under New York law a plaintiff may recover his loss of earnings, medical expenses, and mental and physical pain and suffering."  *Gonzalez*, 2020 WL 1548067 at *7. "[P]ersonal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification . . . ." *Malmberg v. United States*, 816 F.3d 185, 198 (2d Cir. 2016) (quoting *Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (1st Dep't 2003)).  "Guidance may be found . . . in prior awards involving similar torts, similar injuries, or both."  *Gonzalez*, 2020 WL 1548067 at *8 (quoting *Grynberg v. City of New York*, No. 08-cv-2895 (FB), 2010 WL 2985914, at *5 (E.D.N.Y. July 27, 2010)).  *Gonzalez* and *Mann* provide a good spectrum upon which Ms. Avilez's award can be determined.  In *Mann*, the delay in diagnosis was significantly longer than the roughly six-month delay in Ms. Avilez's diagnosis, but the physical pain suffered by the decedent and the time between diagnosis and death in *Mann* was analogous to what Ms. Avilez endured; the decedent underwent radiation, many rounds of chemotherapy, had several hospital trips during this time for related pain, was

weak, and suffered from bone metastasis before passing away twenty-two months after being

diagnosed. 300 F. Supp. 3d at 420-21. The decedent's exact age is unknown, but given that he

had two children born in 1985 and 1987, it is safe to assume he was older than thirty. *See id.* at

414. In *Gonzalez*, which has more analogous timing regarding the delay in diagnosis and period

between diagnosis and death than *Mann*, the plaintiff experienced pain and suffering similar to

that of Ms. Avilez, but also contracted an autoimmune syndrome that forced him to have a

feeding tube and left him in a state such that he could not be left unattended. 2020 WL 1548067

at * 8. Similarly, decedent's exact age is unknown, but given that he was married for several

decades, it again is fair to assume he was well beyond age thirty. *See id.* at *9.

Ms. Avilez experienced considerable pain and suffering, including pain associated with

bone metastases that required her to take morphine and ultimately prevented her from walking

on her own, the mental anguish of being a young mother facing a deadly disease and the fear of

leaving her young child without a mother in addition to the distress at not being able to physically

mother her son while receiving treatment in the same ways she did previously. For example, she

could not play with him in the same way, help him with school in the same way, cook for him and

the like. Her suffering also included loss of sleep and the attendant problems that causes. (Avilez

Dep. at 13:13-24, 14:2-10, 15:25-16:3, 16:15-17:3; 18:2-13, 18:19-25, 17:13-16, 20:2-12, 19:12-25;

J. Viera Tr. at 27:11-28:16, 29:3-5, 30:1-12, 30:19-23; A. Viera Tr. at 24:17-25:4.) Based on this,

the Court awards Ms. Avilez $1 million for her pain and suffering experienced between diagnosis

and death, less the percentage Ms. Avilez was comparatively negligent.

Under New York law, damages for the loss of parental guidance are also available. *See*

*Ramirez v. Chip Masters, Inc.*, No. 11-cv-5772 (WFK) (MDG), 2014 WL 1248043, at *11 (E.D.N.Y.

Mar. 25, 2014) (citing *Zyqmunt v. Berkowitz*, 754 N.Y.S.2d 313, 314 (2d Dep't 2003)); *see also* N.Y.

Est. Powers & Trusts Law § 5-4.3 (providing that family members, who are the beneficiaries of wrongful death suits, may be awarded damages for "fair and just compensation for the pecuniary injuries resulting from the decedent's death").  Plaintiff seeks an additional $2 million for the loss of parental guidance on behalf of Aizak Viera, Ms. Avilez's son.  The Government opposes this amount claiming it to be too great of an award.  "In determining compensation, courts have considered the loss of valuable services in the nature of instruction, training and guidance," as well as "the age and number of decedent's children in determining the appropriate amount of damages."  *Collado v. City of New York*, 396 F. Supp. 3d 265, 281 (S.D.N.Y. 2019).  Courts also look to "the degree of dependency of the distributees upon the decedent and the probable benefits they would have received but for the untimely death."  *Id.* at 280 (quoting *McKee v. Colt Elecs. Co.*, 849 F.2d 46, 52 (2d Cir. 1988)).  However, "[c]ourts recognize that pecuniary damages resulting from death usually lack direct evidence."  *Id.* at 280.  Finally, testimony from a surviving spouse can be sufficient evidence to support pecuniary damages.  *Ramirez*, 2014 WL 1248043 at *11.

The Court now turns to a review of analogous New York case law.  In *Collado v. City of New York*, a case involving a police officer's shooting and killing of a man who inserted himself into a physical fight between a plain-clothes officer and suspected drug dealer, the court upheld the jury's award of $1.5 million in damages on behalf of the man's six children, aged two to fifteen at the time of their father's death.  *Id.* at 271 n.8 & 280-81.  The award was upheld despite plaintiff's failure to present any evidence on the monetary value of the decedent's services, providing only anecdotal testimony from the wife and a child of decedent.  *Id.* at 280-81 & n.18.  In *Ramirez v. Chip Maters, Inc.*, a case involving the accidental death of a restaurant worker who was mortally crushed by a dough-mixing machine, the court awarded $1 million in damages on behalf of decedent's then seven-month-old child.  2014 WL 1248043 at *2-3, 11.  At the time of death,

decedent had a weekly salary of $480 and was twenty-two years old.  *Id.* at 3.  Finally, in *Snuszki v.*

*Wright*, a husband of unknown age committed second degree murder against his estranged wife,

also of unknown age, leaving behind two children, who were awarded $1 million in total for the

loss of their mother.  824 N.Y.S.2d 519 (4th Dep't 2006).  While none of these cases involved a

single surviving child that is roughly eight years old, *Ramirez* involved a single, infant child, with a

young deceased parent, making little more than New York State minimum wage, and awarded $1

million to that child.  Here, given the similar age of the decedent and earning capacity between

Ms. Avilez and the decedent in *Ramirez*, I find that Aizak Viera is entitled to $1 million to

compensate him for the loss of his mother's parental guidance, less the percentage Ms. Avilez

was comparatively negligent.

Regarding the economic loss damages, the parties have stipulated to those amounts

should the Government be found liable.  However, because the Government is only 50 percent

responsible for Ms. Avilez's injury, Plaintiff can only recover half of the stipulated to total, which is

$237,540.  Therefore, Plaintiff is entitled to $118,770 in damages stemming from economic loss of

earning and household services.

Finally, Plaintiff seeks attorneys' fees and costs.  The FTCA does not provide for an award

of attorney fees.  *See Velez v. United States*, No. 83-cv-7021 (TPG), 1989 WL 51842, at *1 (S.D.N.Y.

May 9, 1989).  The FTCA provides for recovery of certain limited categories of costs, none of

which include attorneys' fees.  *See* 28 U.S.C. §1920.  Given Plaintiff's lack of argument at trial, and

given Plaintiff's failure to show that he is legally entitled to attorneys' fees, I find that Plaintiff is

not entitled to recover attorneys' fees.  However, Plaintiff may make an application for costs that

are recoverable under the FTCA and should do so by no later than October 30, 2020, providing

proof of such costs.

**CONCLUSION**

For all of the foregoing reasons, the Court holds that Defendant breached the duty of care owed to Ms. Avilez, which proximately caused her to suffer a loss in her chances of surviving her angiosarcoma.  Furthermore, the Court holds that Ms. Avilez's own behavior was an equal proximate cause for her lost chance of survival, meaning that the Defendant is only 50 percent liable for Ms. Avilez's injuries.  As such, Judgment is entered in favor of Plaintiff and against the Government.  But for Ms. Avilez's contributory negligence, Plaintiff would be awarded $1 million for Ms. Avilez's pain suffering damages, $1 million for her son's loss of parental guidance, and the agreed-upon economic losses of $237,540, totaling $2,237,540.  However, because Ms. Avilez and Defendant are equally responsible for Ms. Avilez's injury, Plaintiff's award must be cut in half.  Thus, Plaintiff is awarded $500,000 for Ms. Avilez's pain and suffering, $500,000 for Ms. Avilez's son's loss of parental guidance, and $118,770 in Ms. Avilez's economic losses, for a total of $1,118,770 in damages.

**SO ORDERED.**

Dated: October 1, 2020
       New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

37